Filed 11/4/13  In re Eddie B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re EDDIE B., et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B245681<br>(Los Angeles County<br> Super. Ct. No. CK94951) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO B.,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Senior Associate County Counsel, for Plaintiff and Respondent.

Father, Eduardo B., appeals from a dependency court order declaring his children dependents of the court under Welfare and Institutions Code section 300, subdivisions (a), (b), and (j).[1] Father contends there is no substantial evidence that his minor children suffered or are at substantial risk of suffering serious physical harm such that dependency jurisdiction is appropriate. He also contends there is insufficient evidence to support the dependency court's order removing the children from his custody. He challenges the court's order requiring him to submit to random drug testing as part of his reunification plan, and he argues that the visitation plan is inappropriate. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family consists of Mother, Veronica M., who is married but not to Father; Father, who is also married (to Ms. A.); and three children, Eddie B. (8 years old at the time), Erika B. (6 years old), and Nichole B. (4 years old).[2] The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on July 31, 2012, when DCFS investigated allegations that Father's girlfriend, Gabriela V., beat up Mother in front of the children and that Father physically abused and threatened Eddie and Erika.

Mother told the caseworker the allegations were true, stating that a few months previously, Father had hit Eddie and then threatened to kill everyone after Mother said she would call the police. Mother stated that on June 22, 2012, Father and Gabriela came home intoxicated, and Father threatened to have Gabriela beat up Mother. Gabriela attacked Mother, so Mother went to the police, who helped

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

her retrieve her belongings and move out of the house. Mother obtained a restraining order against Father.

Mother stated that Father was often intoxicated and that he sold liquor illegally out of a house on the corner that he owned. She told the caseworker that Father was associated with a notorious Mexican gang and had threatened to flee to Mexico with the children. She said Father had court-ordered unmonitored weekend visits with the children, but they cried about visiting with Father and did not want to visit him.

Mother's adult son, Jonathan B., played a recording for the caseworker of Eddie crying and saying he did not want to visit Father. Jonathan stated that Father sold liquor illegally and also sold narcotics.

The caseworker interviewed the children privately. Eddie stated that Mother fed him, helped him with his chores and homework, took him to the park, and washed their clothes. He told the caseworker that he was afraid of Father, who owned a machete, a gun, and a sword. He said that Father spent a lot of time at the corner house, where there were bad people like Father who drank all day. He described Father hitting him with a belt, punching him in the stomach and back, and threatening to cut off his tongue with a knife. He remembered the incident when Gabriela hit Mother, stating that Father had been drinking and that Gabriela beat up Mother.

Erika said that Mother took care of her. She told the caseworker that she saw Gabriela pull Mother's hair and push her to the floor. She said that Mother did not hit her, but Father had hit her with a belt and called her "motherfucker." She said that she did not have any marks or bruises but that she was afraid of Father.

Nichole said that Father pushed her against the wall and hit her with his open hand when she misbehaved. She said that Father pulled Mother's hair and

threw her on the bed. She also told the caseworker that Father hit her and her siblings with a belt, but Eddie stated that Father did not hit Nichole because she was his favorite.

On July 31, 2012, Officer Rush and Officer Bartholomy of the Monrovia Police Department accompanied the caseworker on an unannounced visit to Father. Officer Bartholomy reported that around the end of June, he responded to a call from Mother stating that Father was driving past her son Jonathan's house. Officer Bartholomy saw Father's truck at a gas station near Mother. Gabriela was sitting in the passenger seat of the truck.

During the interview, Father was "swaying minimally while standing." The caseworker asked if he had been drinking alcohol. Father said no, he was diabetic and not feeling well. Father admitted that he occasionally smoked and that he drank three or four beers on the weekends, but not if his children were visiting. He denied all the allegations, stating that the children were being manipulated by Mother. He denied threatening Mother or the children and stated that Mother hit the children with a belt, but he had never hit them or called them names. He said that he had 10 children, seven of whom were now adults, and he had no history of child abuse.

Father told Officer Bartholomy that he had a restraining order against Mother, but the officer told him the restraining orders were against him and Gabriela. Officer Bartholomy asked Father why he violated the restraining order, and Father said that he went to the gas station near Mother's house to buy cigarettes because they were cheap there. The caseworker asked Father about his criminal history, and he stated that he had been arrested 25 years previously for transporting drugs, but Officer Bartholomy said that Father's last arrest was in 2009 for assault with a deadly weapon.

4

When asked about the incident between Gabriela and Mother, Father, Gabriela, and Maria R., Paternal Grandmother, stated that Mother attacked Father by pushing him and that Gabriela verbally defended him. Mother then attacked Gabriela. According to Gabriela, Mother did not want to move out of Father's home.

A family friend, Shawn Vigil, told the caseworker that Mother had claimed domestic violence in the past in order to obtain a residency card. Vigil stated that Mother had admitted inflicting wounds on herself to support her domestic violence claim and that Mother did not want to leave Father's house when the police helped her move out.

Paternal Grandmother said that she lived in San Diego and was staying temporarily with her son while she received medical treatment. Paternal Grandmother said that she had never seen Father hit Mother but she had seen Mother hit Father and call him names.

A paternal aunt told the caseworker that she often traveled and so was not present during the incidents, but she had heard that Mother was using drugs or alcohol. The paternal aunt repeated the allegation that Mother had claimed domestic violence in a previous marriage to obtain a residency card.

Father showed the caseworker and officer the corner residence where he allegedly sold alcohol illegally, explaining that his adult children lived there and he rented some rooms to tenants. The caseworker saw alcohol and a large bar area but no cash register.

The caseworker interviewed Father's wife, Ms. A., who stated that Mother had been Father's lover for 11 years. She stated that Father always treated his children well and did not abuse alcohol or narcotics. Ms. A. also stated that there

5

was no domestic violence in her relationship with Father and that Mother married an American in order to obtain legal residency.

The caseworker consulted Officer Villalobos of the Monrovia Police Department, who had escorted Mother to retrieve her belongings from Father's house after she was assaulted by Gabriela. He stated that Mother appeared frightened and wanted to get away from Father's home. He told the caseworker that the police believed Father was selling alcohol from the corner house but did not have enough evidence to arrest him.

DCFS filed a dependency petition on August 9, 2012, alleging that the children came within the provisions of section 300, subdivisions (a), (b), and (j). The petition alleged that Father physically abused Eddie by striking him with belts and fists, slapping him, and threatening to cut off his tongue with a knife and kill him and the family. The petition also alleged that Mother failed to protect Eddie when she knew he was being abused by Father.

The petition further alleged that Father abused Erika by striking her buttocks with belts, pushing her, pulling her hair and kicking her, and that Mother failed to protect her. The petition alleged that Father struck Nichole with belts and his hands and that Mother failed to protect her. In addition, the petition alleged that Father and Mother had a history of engaging in violent altercations in the children's presence, and that Father slapped Mother and threatened to kill her and the children.[3] According to the detention report, Mother had been arrested for burglary and Father had been arrested for possession of marijuana for sale, sale/transport of marijuana, assault with a deadly weapon, and making a threat with an intent to terrorize.

---

[3]    The petition also alleged that Father had a history of alcohol and cocaine abuse, but that allegation was dismissed by the dependency court.

At the detention hearing, Father contended that the children were being coached. The dependency court found that a prima facie showing had been made that the children were persons described by section 300, subdivisions (a), (b), and (j), and ordered the children detained. The court ordered that the children have no contact with Gabriela, ordered the parents to attend a Parents Beyond Conflict program together, and granted both parents monitored visits, but not together.

In a jurisdiction/disposition report filed on September 6, 2012, DCFS reported that Eddie was living with a foster mother, the other two children were with a different foster mother, and Mother was living at a confidential address. Mother, Father, and the children were interviewed for the report.

According to the report, Eddie stated that Father sometimes hit him with a belt and one time punched him in the stomach. He saw Father hit Erika when she dropped food on the floor, and he said that Father hit Mother on the head and back. He stated that Father had a gun and a big knife and reported that Father threatened to cut off his tongue when he did not listen to Father. Eddie reported that Father had an illegal bar in the corner house and drank every day.

Erika stated that Father spanked them with a belt and also reported that Father threatened to cut out Eddie's tongue with a knife. She said that Father "punishes us forever in the night" and that Mother did not hit them. According to Erika, Mother and Father yelled at each other but did not hit each other, although she did report that Father hit Mother once.

Nichole stated that Father spanked her with a belt and hit her siblings with a belt.

Mother stated that in May 2012, she heard a banging noise and heard Eddie call for her. She went to Eddie's room and saw him kneeling on the floor and Father standing over him making a fist. Mother stood in front of Father and told

him to get away or she would call the police. Father left the room. Eddie told Mother that Father punched him in the stomach. Father returned to the room, threw Mother against the wall, and pulled her up by the hair.

Mother said that Father did not hit her often, but he had threatened to kill her and the children if she called the police. She suspected him of using cocaine because she saw him and Gabriela at the corner house with a mirror, white powder, and a rolled up dollar bill. She also had seen mirrors and straws in their bedroom, and she suspected that he used drugs because sometimes he would not sleep for several days.

Father denied ever hitting the children or Mother and accused Mother of coaching the children to make those statements. He said that he had four children with his first wife and raised his second wife's children and had never been accused of domestic violence or physical abuse. He stated Mother left, taking the children's passports and his cars, because she had a lover. Father said that he drank occasionally but did not get drunk. He reported that after Mother moved in with him, she often would leave at night and not return until the following morning and then sleep all day.

The foster parents reported that Mother and Father had been appropriate during their visits.

The caseworker concluded that Mother's and Eddie's statements had been inconsistent and that it was not clear if Eddie was telling the truth or if he had been coached. The caseworker also stated that there was no clear evidence to support the allegations of Father's substance abuse, noting that Father's on-demand drug test was negative and that he was willing to consent to drug tests. Although it was unclear if there was abuse in the home, there was family conflict that was affecting the children. The report recommended that the children remain in foster care and

8

that Mother and Father be provided with reunification services and monitored visits.

In last minute information for the court, a dependency investigator reported that Yvette B., Father's adult daughter, stated that she had never seen Father hit her younger siblings and that she had never been abused by Father. Yvette stated that Father was diabetic and so did not drink. She suspected that Mother used drugs because Mother would stay out all night and then sleep all day.

In October 2012, the children were ordered released to Mother pending the adjudication/disposition hearing.

At the November 2012 adjudication hearing, Father asked that the petition be dismissed. At DCFS' request, the court dismissed the substance abuse allegation against Father. The court acknowledged that there were some inconsistencies in the statements, but, reasoning that the children had been adamant regarding their allegations, the court found the allegations to be true. The court declared the children dependents of the court and ordered them placed in Mother's home. The court ordered Father to attend a 52-week batterer intervention program and to submit to weekly random and on-demand drug and alcohol tests. The court ordered monitored visits for Father. Father appeals from the jurisdictional and dispositional findings.

## DISCUSSION

Father contends that the evidence is insufficient to support the court's assumption of jurisdiction. He further contends that the evidence is insufficient to support the order removing the children from his custody and that other reasonable alternatives were available. Father also challenges the order requiring him to

submit to drug tests.  Finally, Father contends that the visitation plan is inappropriate.

I.    *Jurisdiction*

To assert jurisdiction over a minor the juvenile court must find that he or she falls within one or more of the categories specified in section 300.  (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185 (*Veronica G.*).)  DCFS bears the burden of proving by a preponderance of the evidence that the minor comes under the juvenile court's jurisdiction.  (*Ibid.*)  "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.  [Citation.]  Substantial evidence is evidence that is reasonable, credible, and of solid value."  (*Ibid.*)  "'In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason.  [Citation.]'  [Citation.]"  (*In re E.B.* (2010) 184 Cal.App.4th 568, 575.)  Our focus is on whether DCFS has proffered substantial evidence that "at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future."  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.)

The dependency court found jurisdiction appropriate under section 300, subdivisions (a), (b), and (j).  "Jurisdiction under section 300, subdivision (a) requires proof that the child suffered or is at substantial risk of suffering 'serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.'"  (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716 (*Daisy H.*).)

Dependency jurisdiction may be asserted under section 300, subdivision (b) where DCFS establishes that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).) Under section 300, subdivision (j), DCFS must establish that "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the dependency court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Father contends that the evidence is insufficient to support the court's jurisdictional findings because there was no physical evidence that he abused the children and the statements supporting the findings were inconsistent. He points

11

out that he has consistently denied any abuse and that he had no history of child abuse.

Father further contends that no other family members reported seeing domestic violence and that the family friend who was interviewed told the caseworker that Mother admitted inflicting bruises on herself in order to falsely claim domestic violence. He also relies on the social worker's conclusion that Mother's statements about the physical abuse were inconsistent.

The dependency court considered the evidence and concluded that jurisdiction was appropriate. The fact that there were witnesses who disputed the allegations of abuse is not sufficient to defeat jurisdiction. In reviewing the dependency court's jurisdictional finding, "[w]e do not reweigh the evidence, nor do we consider matters of credibility. [Citation.]" (*In re E.H.* (2003) 108 Cal.App.4th 659, 669.) Instead, "we determine whether evidence that is of reasonable, credible and solid value supports the dependency court's findings." (*Ibid.*)

We conclude that the statements by the children and Mother constitute sufficient evidence to support the court's jurisdictional finding. Eddie was interviewed for the initial detention report and again while he was in foster care, and both times he stated that Father hit him with a belt and once punched him in the stomach. Mother also described the incident in which Father punched Eddie in the stomach. Eddie also was consistent in his statements that Father called him bad words and threatened to cut off his tongue with a knife.

Erika also was interviewed twice, and she consistently stated that Father hit her with a belt and once pulled her hair and pushed her onto the bed. Eddie also described seeing Father pull Erika's hair and push her onto the bed, and Mother stated that Erika had told her about this incident. In the initial interview, Eddie and

12

Erika told the caseworker that they were afraid of Father. In the second interview, Erika told the caseworker that she was afraid of Father but not of Mother.

In both interviews, Nichole stated that Father hit her and her siblings with a belt. She also stated that Father pushed her against the wall.

Although there were some inconsistencies in Mother's and Eddie's statements, the dependency court took those inconsistencies into consideration in making its decision. The court reasoned that, despite the inconsistencies, the children were "adamant in their standing by the information they've provided." Resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment (*Veronica G.*, *supra*, 157 Cal.App.4th at p. 185), we conclude that the court's finding is supported by substantial evidence.

The lack of physical evidence of abuse is not sufficient to defeat jurisdiction. "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 165-166.)

Father contends that the lack of physical evidence of abuse renders this case similar to *Daisy H.* But in *Daisy H.*, not only was there no physical evidence of abuse, there was also no allegation of abuse or statements from the mother or children describing abuse. Instead, the dependency petition alleged that the father abused the mother and that this placed the children at risk of physical and emotional harm. (See *Daisy H.*, *supra*, 192 Cal.App.4th at pp. 715-716 [describing the allegations in the petition].) In fact, DCFS acknowledged that the father "'has not been abusive towards the children and has not made threats to hurt the children . . . .'" (*Id.* at p. 716.) Thus, "[t]here was no evidence that Father ever intentionally harmed any of his children or that the children were at risk of

13

intentional harm." (*Ibid.*) By contrast, in the instant case, there was evidence that Father intentionally harmed the children.

II.      *Removal from Father's Custody*

Father's second contention is that there was insufficient evidence to support the dependency court's decision to remove the children from his custody and that there were reasonable alternatives to removal. He relies on section 361, which addresses the court's authority to remove a child. Under section 361, subdivision (c), a child may not be taken from the custody of the parent unless the court finds clear and convincing evidence of one of several circumstances. The court's "jurisdictional findings are prima facie evidence the child cannot safely remain in the home. (§ 361, subd. (c)(1).)" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).)

"'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.' [Citation.]" (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.) "'"'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' [Citations.]" [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]'" (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581 (*Mark L.*).)

14

The dependency court relied on section 361, subdivision (c)(1), finding by clear and convincing evidence that remaining in the home of Father would pose "a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the children, and that there were "no reasonable means other than removal to protect the children." (§ 361, subd. (c)(1).)

DCFS points out, however, that Father was a noncustodial parent. Thus, the court should have proceeded under section 361.2, not section 361. Under section 361.2, the court is required to "consider whether placement with the noncustodial parent would be 'detrimental to the safety, protection, or physical or emotional well-being of the child.' A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm. [Citation.]" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.) The court's decision is reviewed for substantial evidence. (*Id.* at p. 1424.) This standard is less onerous than that of section 361, which requires a finding not of mere detriment, but of substantial danger.

Here, relying on section 361, the court found by clear and convincing evidence that remaining in the home of Father would pose a substantial danger to the children's well-being. That finding subsumes a finding of detriment, and thus the court's error in relying on section 361 was harmless. Further, for reasons already stated, substantial evidence supports that finding.

Father relies on *Hailey T.* There, the juvenile court removed the child from the home even though there was no evidence in the record that the child "was ever a victim of abuse in the parents' home, or that she suffered any harm as a result of the abuse that the court found with respect to [the sibling]." (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 147.) In addition, the record contained "abundant evidence that [the parents] were good parents who enjoyed a healthy relationship. There was no

15

evidence of ongoing physical domestic violence between the parents; indeed there was no evidence of *any* physical domestic violence between the parents during their nine-year marriage. Neither parent had substance abuse problems, and there was no evidence that either suffered from mental health conditions, developmental delays or other social issues that often are at the root of dependency cases and might place children at continuing risk in the home." (*Ibid.*)

Unlike *Hailey T.*, here the record contains substantial evidence that the children removed from Father's custody were abused by Father. Also unlike *Hailey T.*, there was evidence here of ongoing domestic violence between the parents. (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 147.) Thus, *Hailey T.* does not support Father's argument.

III.    *Reunification Plan*

Father challenges the court order that he participate in weekly random drug testing, arguing that the allegation of substance abuse did not support the court's jurisdiction finding. At DCFS's request, the dependency court dismissed the allegation in the petition that Father had a history of alcohol and cocaine abuse. Nonetheless, the court ordered weekly drug tests for Father.

"At the dispositional hearing, the juvenile court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. (§ 361.5, subd. (a); Cal. Rules of Court, rule 1456(f)(1).) The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. [Citations.] We cannot reverse the court's determination in this regard absent a clear abuse of discretion. [Citation.]" (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)

16

Father contends that his case is similar to *In re Sergio C.* (1999) 70 Cal.App.4th 957, in which the court found the evidence insufficient to sustain the dependency court's drug testing order. In *Sergio C.*, however, unlike the instant case, the appellate court found and DCFS conceded that there was insufficient evidence to support the order sustaining the section 300 petition in the first place. (*Id.* at p. 960.) The mother in *Sergio C.*, who was using drugs and had abandoned her child, told DCFS that the father used drugs, but he denied he had ever used or sold drugs. Thus, the only evidence that the father used drugs was "the unsworn and uncorroborated allegation of an admitted drug addict [the mother] who has abandoned her children." (*Ibid.*) The court reversed the drug testing order, stating that where "the custodial parent has flatly denied all involvement with drugs and has otherwise cooperated fully with all of the court's orders, there must be *some* investigation by DCFS to warrant the kind of invasive order that was made here." (*Ibid.*)

Unlike the father in *Sergio C.*, Father is not the custodial parent, and the petition was sustained against him. Also unlike *Sergio C.*, there was evidence here of alcohol and drug abuse other than a vague, unsupported allegation from Mother. For example, at the first visit to Father's house, the caseworker and officer noticed that Father was "swaying." Eddie reported that Father drank every day. Officer Villalobos corroborated Mother's allegation that Father was selling alcohol illegally from the corner residence. Further, Mother had given the police specific information about seeing a mirror, white powder, and a rolled up dollar bill at Father's corner house, as well as mirrors and straws in the bedroom. DCFS' investigation also revealed that Father had been arrested for possession of marijuana for sale and sale/transport of marijuana. Thus, the order that Father undergo drug testing was supported by evidence in the record.

17

Father also relies on *In re Jasmin C.* (2003) 106 Cal.App.4th 177, in which the court considered whether the juvenile court properly required the nonoffending parent to attend a parenting class. In *Jasmin C.*, the mother was ordered to attend a parenting class even though she "was nonoffending under the petition[,] . . . did not abuse her children, fail to protect them, or engage in any other inappropriate behavior." (*Id.* at p. 181.) Unlike *Jasmin C.*, in the present case, Father is an offending parent, and there is evidence in the record of alcohol and drug abuse.

Father contends that the drug testing order will not help resolve the conditions that led to the dependency. However, the event that precipitated DCFS' investigation was the incident in which Father allegedly came home intoxicated and threatened to have Gabriela beat up Mother. We conclude that the dependency court did not abuse its discretion in ordering Father to submit to drug testing.

IV. *Visitation Plan*

Father contends that the visitation plan inappropriately restricts his visits with his children and will impede his reunification with his children.

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.] '"In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact."' [Citation.] Even if there is no substantial conflict in the evidence, we must nevertheless draw all legitimate inferences in support of the findings of the juvenile court." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

18

"Visitation between a dependent child and his or her parents is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings. [Citation.] Visitation 'shall be as frequent as possible, consistent with the well-being of the child.' (§ 362.1, subd. (a)(1)(A).) However, '[n]o visitation order shall jeopardize the safety of the child.' (§ 362.1, subd. (a)(1)(B).) It is ordinarily improper to deny visitation absent a showing of detriment. [Citations.]" (*Mark L.*, *supra*, 94 Cal.App.4th at p. 580.)

Father's challenge to the visitation order is based on the same arguments he raises throughout: that he "had no history of involvement in the child welfare system, no history of child abuse, and had cooperated with the department throughout the process." He again argues that the evidence does not support the dependency court's findings that he abused the children at all or that they would be in danger if placed with him. We have reviewed the record and found that the court's jurisdictional and dispositional orders are supported by substantial evidence.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.


SUZUKAWA, J.

20